COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-199-CR

 

 

AUNDRE ROSS WILLIAMS 

A/K/A AUNDRE WILLIAMS                                                    APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 213TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction

In two points, Appellant
Aundre Ross Williams a/k/a Aundre Williams appeals his conviction of aggravated
robbery with a deadly weapon, to wit: a firearm.  We affirm.

 








II.  Factual and Procedural Background

This is the case of
Cinderella=s slipper.

A. The Robbery








On December 30, 2004, Abbas
Habib, the owner of Mr. A Beer Beverage and Sandwiches (AMr. A=s@) in Arlington, Texas, left his store in the care of an employee and
drove to the bank to withdraw a considerable sum of money.[2]  Shortly before 4:00 p.m., Habib returned to
the store and parked his car in its usual spot. 
As he exited his car, another vehicle pulled up beside him and an
African-American man got out on the passenger=s side.  The man pointed a gun
at Habib and demanded that he hand over the money bag.  Habib refused and a struggle over the money
bag ensued.  The man struck Habib over
the head with the butt of the gun ten to fifteen times until Habib relinquished
control over the money.  Before jumping
back into the getaway car, the man fired a single shot into a nearby car to
scare approaching bystanders.  After
beating Habib and leaving him bleeding in the parking lot, the man attempted to
make a clean getaway from Mr. A=s.  However, his shoe got caught
on the tire of Habib=s car and it
slipped off his foot.  Like Cinderella,
the man failed to stop for the shoe, jumped in the getaway car, and fled the
scene.  He also dropped a nearly empty
Newport cigarette pack. 

B. The Witnesses

Eyewitness Ramon Garay had
been stopped in traffic on Abram Street in front of Mr. A=s and had seen the attack on Habib from a distance of twenty to thirty
feet.  Garay testified that he had a
clear line of sight to the man with the gun and the car that he got into.  Garay followed the getaway car as it sped out
of the parking lot. 








Garay testified that after
the car turned on Gay Street, Williams jumped out of the car and ran off in the
direction of the railroad tracks.[3]  He further testified that the driver of the
car abandoned the vehicle a few blocks later and fled on foot before being
picked up by a dark-colored minivan.[4]  Garay flagged down Arlington Police
Department Detective Bill Pino, a patrol officer at the time, and led him to
the abandoned car before returning to Mr. A=s.[5]
Garay identified Williams in a photo line-up and in open court as the man he
saw attack Habib with a gun and jump into the getaway car.  

Meanwhile, back at Mr. A=s, Arlington patrol officers Jeff Pue and Jennifer Moffit, and crime
scene investigator Ignacio Acosta, were processing the scene and speaking to
eyewitnesses about the attack on Habib. 
Officer Pue arrived first and spoke with Habib and his employee,
Mahendro Cheta.[6]  Officer Pue also photographed and marked with
cones the shoe and cigarette pack left by the assailant.  Officer Moffit maintained the crime scene
log, detailing who entered and left the scene, and spoke to three additional
eyewitnesses of the attackCDavid DeRocha,[7]
Jean Givens, and Jake Driver.[8]


 








C. The Investigation

Investigator Acosta arrived
on the scene to collect and seal the shoe and cigarette pack left by the
assailant during his hasty departure from Mr. A=s.  Acosta sent the shoe to the
Tarrant County Medical Examiner=s Office for testing.  He also
collected money found near the abandoned car. 
No usable fingerprints were found on the money or the car.  However, using black magnetic powder, two usable
latent prints were lifted off the cigarette pack.  Comparing the prints lifted from the
cigarette pack with those of Williams, Acosta testified that based on his
analysis Williams was the source of the latent prints.[9]









Detective Brian Johnson was
in the Acrimes against persons@ unit of the Arlington Police Department at the time of the attack on
Habib.  It was Detective Johnson=s job to work leads from his investigation of this and similar
offenses and develop a suspect. 
Detective Johnson spoke to eyewitnesses of the attack, including Douglas
Burnett.[10]  Burnett identified Williams in open court as
the man who jumped from the car, though he admitted he told the police during
their investigation that he couldn=t pick the man out of a line-up. 








Detective Johnson also
created the initial photo line-up of suspects, which included the photograph of
a man suspected of committing offenses similar to the attack on Habib.  He showed the line-up to Habib and a half-dozen
eyewitnesses of the attack.[11]  No positive identification was made by any of
the witnesses, including Habib.  After
further investigation of the DNA found inside the shoe and the fingerprints on
the cigarette pack, Detective Johnson finally had a substantial lead on the man
who attacked Habib.  Unlike the search
for Cinderella, investigators were able to identify the wearer of the lost shoe
by taking a DNA swab from the shoe and running it through the Combined Offender
Data Information System (CODIS) database.[12]   The DNA in the shoe was a match to Williams.


Three to four months after
the attack, Detective Johnson created a second line-up containing Williams=s photograph among the suspects. 
Garay picked Williams out of the second line-up as the assailant.  Habib could not make a positive
identification of the assailant, but testified in court that he could only say
that Williams Alooks very
similar.@  Detective Johnson could not
locate any of the other witnesses by the time he had created the second
line-up.[13]









Detective John Bell took over
the investigation from Detective Johnson after Johnson was promoted.  Detective Bell checked with Harris County and
the Texas Department of Corrections to confirm that Williams had not been in
custody at the time of the offense.  He
then prepared a search warrant for Williams=s saliva based the DNA profile match from  CODIS. 
After a magistrate issued the warrant, he went to the Green Bay
detention facility in Tarrant County and took four buccal swabs from Williams=s mouth.[14]  Each sample was sealed in sanitary packaging
and marked with evidence tape.  Detective
Bell took the swabs to the Medical Examiner=s office for testing and comparison.    Once
again, Patton generated a DNA profile, this time from Williams=s buccal swabs.  Patton=s analysis provided a match between the DNA from the shoe and the
samples taken from Williams.  She
testified that her statistical analysis indicated that the DNA profile would
not be repeated in a population many times more than the Earth=s population.  In short, she
concluded that the DNA from the shoe could have only come from Williams or an
identical twin. 

D.  The Trial

At the close of the State=s case, Williams moved for a directed verdict.  The court denied his motion, and the defense
proceeded with its case by calling one witness before resting. 








Williams=s step-father and pastor, Robinson Tracy Burleson, testified that Williams
often donated shoes to their church in Houston to be sold at its regular garage
sales.  He testified that it was possible
that the black Reebok found at Mr. A=s in Arlington was one of the shoes Williams had donated in
Houston.  Burleson also testified from
his own personal knowledge that Williams had been working at the church in
Houston on December 30, 2004, from 10:00 a.m. to 6:00 p.m., and on December 31,
2004, from 10:00 a.m. to 3:00 p.m.  He
testified that he had provided proof of Williams=s employment to his parole officer, but nothing was provided to
officers or detectives in Arlington or to prosecutors in Tarrant County.  

After hearing arguments and
evidence from both the State and Williams, the jury found Williams guilty of
one count of aggravated robbery with a deadly weapon, as charged in the
indictment.  Following the jury=s guilty verdict, Williams entered a plea of Anot true@ as to the
repeat-offender allegation.  At the
punishment hearing, the State presented evidence to substantiate the
repeat-offender notice of the indictment. 
The jury subsequently found the allegation of prior convictions true,
and assessed Williams=s punishment
at thirty-eight years=
confinement.  This appeal followed.

III.  Sufficiency of the Evidence

In his first point, Williams
contends that the evidence presented by the State was factually insufficient to
prove the identity of Williams as the actor in the charged offense.  We disagree.








 

A. Standard of Review

When reviewing the factual sufficiency
of the evidence to support a conviction, we view all the evidence in a neutral
light, favoring neither party.  Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the fact-finder=s determination is clearly wrong and manifestly unjust or whether
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s determination is manifestly unjust. 
Watson, 204 S.W.3d at 414B15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Application








As detailed above, the State
presented a substantial amount of evidence against Williams at trial.  The State presented evidence that Williams=s fingerprints matched those found on the cigarette pack dropped at
the scene and that his DNA matched that lifted from a shoe that witnesses
testified came off his foot while he was trying to flee.  The State further offered the testimony of
eyewitnesses, who identified Williams both in and out of court as the assailant
in the attack on Habib outside Mr. A=s.

Williams proffered an
alternative theory as to how his DNA may have ended up on the evidence
collected from Mr. A=s after the
attack on Habib.  Specifically, Williams=s pastor and step-father testified that Williams often donated his
shoes to their church in Houston to be sold at its garage sales.  Accordingly, he testified that a pair of
Williams=s donated shoes from Houston could have been worn by someone else in
commission of the offense against Habib which happened in Arlington.  Williams=s step-father presented an alibi for Williams on the day of the
offense, stating that Williams was working at the church in Houston.  However, the jury agreed with the State.

We may not simply substitute
our judgment for the jury=s.  Johnson, 23 S.W.3d at 12; Cain,
958 S.W.2d at 407.  Under these facts,
the record does not clearly reveal that a different result is appropriate;
therefore, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence.  Johnson, 23 S.W.3d at
8.  Resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Id.








Therefore, we hold that the
evidence supporting Williams=s conviction was not so weak that the jury=s determination was clearly wrong or manifestly unjust.  Furthermore, we hold that the conflicting
evidence did not so greatly outweigh the evidence supporting Williams=s conviction that the jury=s determination was manifestly unjust. 
See Watson, 204 S.W.3d at 416B17; Johnson, 23 S.W.3d at 11. 
Accordingly, we hold the evidence factually sufficient to prove the
identity of Williams as the actor in the charged offense of aggravated robbery
with a deadly weapon.  We overrule
Williams=s first point.

IV.  Admission of Prior Convictions

In his second point, Williams
contends that the trial court erred by allowing the admission of judgments of
prior convictions at the punishment phase. 
In sum, Williams argues that the State did not present independent
evidence that he was the person named in the prior judgments.  We disagree.

A.  Standard of Review

An appellate court reviews
the admission of evidence for an abuse of discretion.  See Griffin v. State, 181 S.W.3d 818,
820 (Tex. App.CHouston
[14th Dist.] 2005, pet. ref=d).  So long as the trial court=s decision was within the zone of reasonable disagreement, the
appellate court will not disturb it on appeal. 
See id.  

 

 








B.  Applicable Law

During the punishment phase
of a criminal trial, the court may admit evidence of prior criminal
convictions.  Tex. Code Crim. Proc. Ann. art. 37.07, ' 3(a)(l) (Vernon 2006).  The
State may introduce authenticated copies of state prison records and certified
copies of a judgment and sentence to show that a defendant committed another
crime.  See Tex. R. Evid. 901(b)(7); Beck v.
State, 719 S.W.2d 205, 210 (Tex. Crim. App. 1986).  However, these documents alone are not
sufficient to prove a prior conviction.  See
Beck, 719 S.W.2d at 210.  The State
must present independent evidence that the defendant is the person named in the
prior conviction.  Id.; Howard
v. State, 896 S.W.2d 401, 405 (Tex. App.CAmarillo 1995, pet. ref=d); Rosales v. State, 867 S.W.2d 70, 72B73 (Tex. App.CEl Paso
1993, no pet.).  The Texas Court of
Criminal Appeals recently reaffirmed that there are a number of ways for the
State to prove a prior conviction.   

To
establish that a defendant has been convicted of a prior offense, the State
must prove beyond a reasonable doubt that (1) a prior conviction exists, and
(2) the defendant is linked to that conviction. 
No specific document or mode of proof is required to prove these two
elements. There is no Abest
evidence@ rule
in Texas that requires that the fact of a prior conviction be proven with any
document, much less any specific document. While evidence of a certified copy
of a final judgment and sentence may be a preferred and convenient means, the
State may prove both of these elements in a number of different ways,
including: 

 








(1)
the defendant=s
admission or stipulation, 

 

(2)
testimony by a person who was present when the person was convicted of the
specified crime and can identify the defendant as that person, or 

 

(3)
documentary proof (such as a judgment) that contains sufficient information to
establish both the existence of a prior conviction and the defendant's identity
as the person convicted.

 

Just
as there is more than one way to skin a cat, there is more than one way to
prove a prior conviction.

 

Flowers v. State, 220 S.W.3d 919, 921B22 (Tex. Crim. App. 2007) (citations omitted).  Moreover, the court of criminal appeals has
also stated that one manner of proving a prior conviction is through A introduction of certified copies of the judgment and sentence and record
of the [Texas Department of Corrections] or a county jail, including
fingerprints of the [accused], supported by expert testimony identifying them
as identical with known prints of the defendant.@  Littles v. State, 726
S.W.2d 26, 28 (Tex. Crim. App. 1984).   

C.  Application













In this case, the State
offered evidence at the punishment hearing to substantiate the repeat-offender
notice of the indictment.  The State
introduced two certified judgments from Brazoria County; one for reckless driving,
and the other for the unlawful carrying of a weapon.  Such copies are admissible, but not
sufficient in and of themselves.  See Tex. R. Evid. 901(b)(7); Beck,
719 S.W.2d at 210.  Thus, the State
called Deputy Charles Kaiser of the Tarrant County Sheriff=s Office to testify as a fingerprint expert and provide evidence that
Williams was the person named in the prior judgments.  Deputy Kaiser took Williams=s fingerprints in court and compared those prints with the fingerprints
contained in the pen pack for Williams=s alleged prior convictions.  He
testified that the prints in both judgments matched Williams=s fingerprints taken in court. 
As additional proof that Williams was the person named in the prior
judgments, Deputy Kaiser testified that he had compared the Social Security
numbers, driver=s license
numbers, and dates of birth listed on the certified copies of Williams=s two prior judgments with the Tarrant County mainframe computer data
on Williams, and all the identifying data matched.  Deputy Kaiser testified that the information
in the Tarrant County mainframe is provided by the arrestee, and that Social
Security numbers and Texas driver=s license numbers are unique to each person.  This evidence, combined with the expert
testimony regarding the fingerprint match, was sufficient to prove that
Williams was the person whose convictions were reflected in the certified prior
judgments admitted as State=s evidence.  See, e.g.,
Flores v. State, 139 S.W.3d 61, 64 (Tex. App.CTexarkana 2004, pet. ref=d) (holding factually sufficient to link the defendant to the prior
judgment an officer=s testimony
that the defendant=s driver=s license number and address matched the driver=s license number in the certified license history that was in
evidence).

Therefore, we hold that the
State presented independent evidence that Williams was the person named in the
prior judgments, and thus the trial court did not abuse its discretion by
allowing the jury to hear evidence of those prior convictions at the punishment
phase.  See Howard, 896 S.W.2d at
405.  Accordingly, because the trial
court=s decision was within the zone of reasonable disagreement, we will not
disturb it on appeal.  See Griffin,
181 S.W.3d at 820.  We overrule Williams=s second point.

V.  Conclusion

Having overruled Williams=s two points, we affirm the trial court=s judgment.           

 

PER CURIAM

 

PANEL F:    MCCOY, DAUPHINOT, and HOLMAN, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
August 16, 2007











[1]See Tex. R. App. P. 47.4.





[2]Habib
withdrew approximately $20,000 in cash, which he carried in a money bag.  As part of his business, Habib cashed checks
at his store.  He anticipated that the
holiday weekend would bring in a high volume of business. 





[3]Garay
identified on State=s
Exhibit 6, a map of the area, that Williams got out of the car near the Abram
Mechanic Shop at Gay Street and ran towards the railroad tracks. 





[4]Garay
testified that after letting Williams out of the car, the driver headed south
on Overhill Street and abandoned the getaway car near the intersection of Joyce
Street and Overhill Street. 





[5]Detective
Pino testified that the getaway car had been forced open and the steering
column was broken.  He further testified
that it was later discovered that the car had been reported stolen from a DART
parking facility earlier in the day.





[6]Cheta,
who moved back to India at some point after the robbery, but prior to trial,
could only give a vague description of the man who attacked Habib, but said
that he could identify him in a line-up. 
However, by the time a line-up was prepared, three to four months later,
Cheta was unavailable. 





[7]DeRocha
was working at the window tinting shop across the street from Mr. A=s at
the time of the attack.  He testified
that from about fifty feet away, he saw two men fighting in front of the store
when he recognized one of them as Habib. 
He further testified that he saw the assailant strike Habib with a black
gun five to ten times before Habib let go of the money bag.  DeRocha said that he could not identify the
assailant.  





[8]Givens
and Driver were in a car on Abram Street driving past Mr. A=s at
the time of the attack and could only describe the assailant as a black male
who got into the passenger side of a grey car. 





[9]Using
an FBI 8-point identification standard and the ACE-V standard, Acosta first
compared the latent prints from the cigarette pack to Williams=s
prints he obtained from the Texas Department of Public Safety.  He did a second comparison of the latent
fingerprints with those he took from Williams in court.  In both cases, Acosta determined that the
latent fingerprints matched Williams=s known prints. 





[10]Burnett,
who lived behind Mr. A=s,
was waiting with a group of people in front of the store to cash a check.  He testified that he saw Habib pull into the
parking lot, and that another car was behind him.  Standing within twelve feet of the attack on
Habib, Burnett testified that a black man jumped out of the passenger side of
the car, hit Habib at least six times with a gun, and shot into a nearby car
before getting back into the car.  As the
man ran to the car, Burnett said that he saw him drop a pack of cigarettes and
catch his shoe on the tire of Habib=s car.  





[11]The
first of the two line-ups did not contain Williams=s
picture.





[12]Constance
Patton, the DNA technical leader at the Tarrant County Medical Examiner=s
Office crime lab, collected and tested samples from the laces and inside of the
shoe.  Patton confirmed, using Short
Tandem Repeat DNA analysis, that the two samples contained DNA from the same
male.  She submitted the DNA profiles to
samples from CODIS, and she got a match from Harris County.  She forwarded this information to the
investigating detectives, who conferred with Harris County to obtain
identifying information from the CODIS hit. 





[13]One
of the eyewitnesses had since become incarcerated and the others had moved
leaving no forwarding telephone numbers.





[14]It is
unclear from the record why Williams was being detained at the Green Bay
facility.  However, it appears from the
dates involved that his detention was for the offense at issue in this case.